## DETROIT MOTOR CO. *v.* THIRD NATIONAL BANK.

1. BANKS AND BANKING—PLEDGE—COLLATERAL SECURITY.

   Under an agreement with the cashier of defendant bank, complainant corporation mortgaged its property to secure an issue of bonds, which were left in the mortgagee's possession, to be delivered to the cashier, for sale, on his demand, the proceeds to be credited to complainant's account at the bank. A portion of the bonds had been sold and credit given, when, in the absence of the cashier, complainant was notified that certain of its paper was due. An agreement was thereupon made with the assistant cashier that credit should be extended until the cashier's return, upon the condition that the remainder of the bonds should be held by the bank as collateral security, complainant thereupon giving a note reciting that it was secured by said bonds. Upon the cashier's return a renewal was provided for, complainant consenting that the bank should hold the bonds as collateral for all of its indebtedness. The cashier, after obtaining the bonds from the mortgagee, and depositing them in the vaults of the bank, sought to pledge them to the bank as security for his own debt. *Held*, that the bonds were received by the cashier in his official capacity, as collateral to complainant's indebtedness, and that they should be so treated by the bank.

2. SAME—PROOF OF POSSESSION—PRESUMPTIONS.

   Where it is established, in a suit by a pledgor against a bank for an accounting as to certain bonds, that they were delivered over to the defendant as collateral to complainant's indebtedness, it will be presumed, in the absence of contrary evidence, that they either remain in defendant's possession or have been disposed of for its benefit.

3. ESTOPPEL—EQUITY PROCEDURE.

   The receiver of an insolvent bank cannot, in a suit against him to compel him to account for and restore certain bonds deposited with the bank as collateral security, claim on appeal that the proper remedy was at law or by a bill to redeem, averring a willingness to pay the debt, where such claim was not made in the court below, and the receiver went to trial on a claim of title to the bonds.

Appeal from Wayne; Carpenter, J. Submitted November 12, 1896. Decided January 5, 1897.

Bill by the Detroit Motor Company against the Third National Bank and Joseph L. Hudson, receiver, for an accounting as to certain bonds pledged as collateral security. From a decree dismissing the bill, complainant appeals. Reversed.

*George W. Radford* and *Walker & Spalding*, for complainant.

*De Forest Paine*, for defendants.

HOOKER, J. The complainant, a corporation doing a manufacturing business at Detroit, was largely indebted to the Third National Bank of that city and others, and the following scheme was hit upon, in a consultation between complainant's officers and Frederick Marvin, the cashier of the bank, to afford it relief: It was proposed that the complainant should mortgage its plant to the Union Trust Company, to secure an issue of 100 bonds of $1,000 each, said bonds to be guaranteed by several of complainant's stockholders, who were already upon its outstanding paper. Said bonds, when issued, were to be left in the custody of the Union Trust Company, and were to be delivered by it to Frederick Marvin, cashier of said bank, for sale, upon his demand; and, as fast as sold, Marvin was to give the complainant credit for the proceeds, upon its account in said bank. In pursuance of this arrangement, the mortgage and bonds were made and deposited; and a written order upon the trust company for the delivery of such bonds to Marvin, cashier, was given by complainant, and 75 of the bonds were taken by Marvin, and disposed of, and credit given to complainant upon its bank account. Subsequently, Marvin obtained the remaining 25 bonds, numbered, consecutively, from 76 to 100, inclusive; and it is in regard to these bonds that this controversy arises.

The circumstances under which these bonds were taken by Marvin appear to us to be as follows: On September 7, 1892, the complainant received notice that certain paper, which it had given to the Third National Bank, was due, some of it in the hands of the Peninsular Savings Bank, and possibly some in the State Savings Bank. This paper was guaranteed by the Third National Bank, and complainant was notified from said bank that the paper was due. An officer of the complainant called at the Third National Bank to arrange the matter; and, in Mr. Marvin's absence, the assistant cashier, acting under the direction of the board of directors, agreed to extend credit until Mr. Marvin should return, when the matter could be adjusted with him, upon condition that the remaining 25 bonds should be held by the bank as collateral to secure the bank. This was upon an offer by the complainant to so arrange the matter, and after the assistant cashier had ascertained and informed his directors that the bonds were in the hands of the Union Trust Company, subject to the order of Mr. Marvin, cashier. The following is a copy of a note given upon that occasion:

"$20,361.67.        DETROIT, MICH., Sept. 7, 1892.

"On demand after date the Detroit Motor Co. promise to pay F. Marvin, cashier, or order, at the Third National Bank, twenty thousand three hundred and sixty-one 67-100 dollars, with interest at the rate of seven per cent. per annum, value received; having deposited or pledged with him as collateral security, with authority to sell the same at public or private sale, or otherwise, at his option, on the nonperformance of this promise, and without notice, twenty-five thousand dollars of the unsold bonds of the Detroit Motor Co., in the hands of the Union Trust Co. of Detroit, Michigan.

"DETROIT MOTOR CO.,
"By F. A. BLADES, Sect."

Indorsed on back:

"D. B. No. 377.

"This note is given for two notes falling due Sept. 7, 1892; one for $15,271.25, at the Preston National Bank;

one falling due Sept. 7, 1892, at the Third National Bank, for $5,090.42. Said notes to be arranged for on Mr. F. Marvin's return to city.

"Detroit, Sept. 7, 1892.

"By F. A. BLADES, Sect.

"F. A. BLADES."

A few days later, Mr. Marvin returned; and on September 10, 1892, he surrendered this note, at the same time taking renewal notes for those for which it had been given, and obtaining the consent of the complainant that the bank should hold the 25 bonds as collateral security for all debts of the complainant to the bank. Soon after, Mr. Marvin procured the bonds, and deposited them in the vaults of the bank, with its other collateral. It is contended that this is not shown by the evidence, especially as to 10 of said bonds; but, in our opinion, it may be properly inferred from the testimony given.

In October, 1892, Marvin executed his note for $10,000, payable to himself, as cashier, and put the amount to his credit in the bank, without the knowledge of the directors, and without making an entry upon the offering book, as was the custom. Said note stated that he had deposited or pledged, as security, $10,000 of the first mortgage bonds of the complainant. A second note for $5,000 was made May 2, 1893. This stated that he had "deposited or pledged Detroit Motor Co. bonds," without stating the amount. In neither case were the bonds designated by number or otherwise, and they do not appear to have been attached to or to have accompanied the notes. Soon after the date of the second note, Mr. Marvin's conduct was investigated, and his resignation was tendered, but not accepted for some months, it being deemed inexpedient to do so at the time. He was, however, dismissed in September, 1893. At this time the 20 bonds identified by the testimony were found among the securities of the bank which were held as collateral. There was nothing to show that they were not held as collateral to the complainant's paper, or to whom they belonged. Mr. Marvin

is said to have pointed out these particular 20 bonds as collateral to his paper, and claimed that he owned them. Noble, who succeeded Marvin as cashier, testified that they could not tell who owned these bonds, "except they were the only bonds in our possession pledged as collateral to a certain note, and if they were in our collateral file, and had been stated to be the property of the person who pledges them." He also testified that these 20 bonds, which he says were collateral to the Marvin notes (which does not appear from the notes, however), were transferred to what he calls the regular collateral account, in the absence of Marvin. Hudson, a director of the bank, testifies that he learned that the bank had $20,000 of bonds collateral to Marvin's notes, and, with Marvin's consent, they took them away from the notes, leaving the notes without collateral, and gave him credit for $15,000 on his overdraft, and charged them to the bond and mortgage account. The bank was subsequently closed, and went into the hands of a receiver, and this bill is filed to compel the defendants to account for and restore the 25 bonds to the complainant, subject to the right of the bank to hold them as collateral security for the indebtedness of the complainant.

Counsel for the receiver contends:

1. That Marvin, and not the bank, was complainant's agent for the sale of the bonds, and that it is in no way responsible for his appropriation of the bonds.

2. That the bonds were not, in fact, pledged to the bank, because not delivered to the cashier at the bank; and that, legally, they cannot be said to have come to its possession.

3. That, in appropriating these bonds to his own use, Marvin was not acting within the scope of his authority as cashier, and that the bank is not liable for his acts.

4. That complainant has a complete remedy at law.

We are satisfied from the evidence that the scheme of issuing these bonds was the result of the pressure brought by the bank, to induce payment of the complainant's paper held by the bank; but whether this were so or not,

and whether, if it were, we would be justified in holding that the bank undertook the sale of bonds, and that it was within its powers, we are convinced that afterwards, in an attempt to secure itself upon its claims against the complainant, Mr. Marvin, its cashier, demanded and received the bonds in controversy, and brought them into the bank, and deposited them with other collateral security of the bank. It is therefore unnecessary to discuss or pass upon several of the questions raised.

We think that the bank is in no situation to take these securities upon Marvin's indebtedness, and that it holds them as security for the indebtedness of complainant, and the receiver should so apply them. As to 15 of these bonds, there is no dispute over their whereabouts, as they are shown to be in the possession of the bank, which claims title to them. Counsel asks what was done with the other 10, and say that it does not appear. Our opinion is that it satisfactorily appears that all of the bonds were taken to the bank under circumstances that justify the conclusion that they came into the possession of the bank. Beyond this, we agree with defendants' counsel that "it does not appear what became of them;" and we need not conjecture, but may assume that they are in the possession of the defendants, or have been disposed of for their benefit.

It is urged that the complainant's remedy is at law, or, at all events, that it should file a bill to redeem, averring a willingness to pay the debt. This does not appear to have been a mooted question below. Counsel did not see fit to raise it by demurrer, as he might have done, but chose to go to hearing upon his claim of title to the bonds. Under the circumstances, especially in view of the alleged insolvency of the bank, we think this technical defense should not be permitted to prevail. Equity has jurisdiction to compel a replacement of stock held as collateral security, lost through gross negligence or carelessness of, or misapplication by, the pledgee, or payment of its value. Colebrooke, Collat. Sec. § 340.

We are of the opinion that the complainant should be decreed to be the owner of said 25 bonds, subject to the lien of said bank, and that defendants restore the same to the complainant upon tender of payment of its indebtedness, or account for them upon said indebtedness at their par value. It is decreed accordingly, complainant to recover costs of both courts.

The other Justices concurred.